Kimberly G. HILL, et al.,
Appellants/Cross–
Appellees,

v.

KENTUCKY LOTTERY
CORPORATION, Appellee/Cross–
Appellant.

Nos. 2006–SC–000748–DG,
2008–SC–000380–DG.

Supreme Court of Kentucky.

April 22, 2010.

As Modified on Denial of Rehearing
Dec. 16, 2010.

Laurence John Zielke, Keith B. Hunter, Janice M. Theriot, Zielke Law Firm,

PLLC, Louisville, KY, James Hays Lawson, Assistant Attorney General, Frankfort, KY, Counsel for Appellants/Cross–Appellees.

Brent Robert Baughman, Melissa Norman Bork, Greenebaum, Doll and McDonald, PLLC, Jan Michele West, Goldberg Simpson, PSC, Louisville, KY, Counsel for Appellee/Cross–Appellant.

Opinion of the Court by Justice
VENTERS.

The Kentucky Lottery Corporation (KLC) terminated the employment of Robert W. Hill and Kimberly G. Hill on September 1, 1999. Several months later, the Hills filed a lawsuit against KLC in the Jefferson Circuit Court, asserting three claims: 1) unlawful retaliation in violation of KRS 344.280, Kentucky's Civil Rights Act; 2) common law wrongful discharge in violation of public policy; and 3) defamation. Thus began a long and tortuous course of litigation that took the parties through two jury trials in the Jefferson Circuit Court, and two appeals to the Court of Appeals. It now comes to this Court for review of a Court of Appeals decision affirming the circuit court judgment entered after the second trial. Because we believe the trial court erred in setting aside the judgment entered on the first trial verdict, we reverse the Court of Appeals and reinstate the jury verdicts from the first trial. We remand the matter to the Jefferson Circuit Court for further proceedings and entry of judgment consistent with this opinion.

■ In reaching this conclusion, we address the following issues:

1) Whether the trial court still had jurisdiction over the case when it vacated the judgment on the jury verdict of the first trial;

2) Whether the retaliation claims under KRS 344.280 preempted the Hills' claims of wrongful discharge in violation of public policy;

3) Whether the KLC was entitled to dismissal of the defamation claim on the grounds of absolute privilege;

4) Whether the trial court erred when it vacated the judgment entered on jury verdict of the first trial on the grounds that the jury had not been given an instruction on the defense of qualified immunity;

5) Whether the trial court erred in fixing interest on the Hills' verdict at less than 12%; and

6) Whether the trial court erred in the amount of attorneys' fees it awarded to the Hills.

7) Whether the Trial court erred when it denied KLC's objection to the punitive damage instructions on the ground that punitive damages are not available under the Kentucky Civil Rights Act, and, if so, whether that was error was harmless.[1]

---

1. KLC also maintains that the damages awarded at the first trial were excessive and that before that award is reinstated, the excessiveness question should be remanded to the trial court. KLC's original new-trial motion included an assertion that the damages were excessive, but having determined that a new trial was warranted on other grounds, the trial court did not reach that question. Notwithstanding the trial court's reluctance to address the issue, we are persuaded that KLC was obliged under CR 52.04 to request a finding from the trial court on the excessive damage issue if it intended to preserve the issue for appeal. KLC having allowed the issue to expire when it was fresh and amenable to appropriate trial court findings, it cannot now be exhumed, three appeals and some eight years later.

## I. FACTUAL BACKGROUND

The parties strongly disagree over the circumstances that led to KLC's decision to fire Robert and Kim Hill. To fairly present the contested issues of law we must outline the basics of the factual dispute.

Kim and Robert Hill married in 1994, while both were employed by KLC. In 1999, the Hills, and others expressed concern about KLC's treatment of another employee, Edward Gilmore. Gilmore was involved with KLC in a dispute over unemployment benefits. The Hills opposed what they perceived as unlawful discrimination against a disabled worker (Gilmore) by KLC. They claim that KLC tried to pressure Kim to testify untruthfully at Gilmore's unemployment hearing, by saying that he was not legally blind, despite her belief that he was. The Hills claim that after Kim's refusal to perjure herself, KLC began the campaign of harassment and intimidation against them, culminating with the termination of their employment.

KLC denies that version of events, and claims that the Hills were guilty of serious misconduct regarding their work duties, including the falsification of time sheets and work logs so as to misrepresent the work they actually performed, and that they had forged other documents relating to their work. It is not disputed that just before the Hills were fired, KLC prepared a "termination memorandum" for Robert and a "termination memorandum" for Kim, detailing the alleged misconduct. KLC planned to deliver the memos to the Hills and fire them at a scheduled conference. The Hills did not keep the appointment. The memos were placed in their employment records, and a notice of the termination of their employment was mailed to them.

Shortly afterwards, a Louisville television station, WLKY, used the Kentucky Open Records Act to obtain the Hills' employment records, including the termination memoranda. Gilmore's termination led to a protest demonstration in front of the KLC offices in Louisville in which the Hills participated. A WLKY news reporter covering the event publicized Kim's termination memorandum.

## II. PROCEDURAL BACKGROUND

The Hills responded to their termination by filing suit against KLC, asserting three claims: 1) unlawful retaliation in violation of KRS 344.280, based on the Hills' opposition to the alleged mistreatment of Gilmore; 2) common law wrongful discharge in violation of public policy, based on Kim's alleged refusal to commit perjury at the behest of KLC; and 3) defamation, predicated on the allegedly libelous termination memoranda. During the pretrial process, KLC moved for summary judgment arguing that under the doctrine of preemption, the Hills' common law wrongful discharge claims were subsumed under the doctrine of preemption by their claims of unlawful retaliation, under the Kentucky Civil Rights Act, KRS Chapter 344. KLC also moved for dismissal of the defamation claim on the grounds of absolute privilege. Those motions were denied, and the case proceeded to the first of two jury trials. The first trial, which lasted three weeks, resulted in a verdict for the Hills on all claims, awarding compensatory and punitive damages to Robert of $2,654,450.00 and to Kim of $1,697,866.00.

On KLC's motion, the trial court set aside the verdicts of the first trial because the jury instructions on defamation did not provide for the defense of qualified privilege, and because the trial court believed that it had erred in failing to apply preemption to the wrongful discharge claim. We describe that decision in more detail below. The Hills' motion for interlocutory

relief at the Court of Appeals was denied. A second trial was held, resulting in a verdict in KLC's favor on the defamation claim and a substantially lower damage award for the civil rights violation.

In the post-trial proceedings, the trial court awarded the Hills' attorney fees of $212,959.87, and fixed the rate of interest on the judgment at 6%.

The Hills appealed to the Court of Appeals and KLC cross-appealed. The Court of Appeals affirmed the trial court's judgment from the second trial. We granted the Hills' petition for discretionary review and KLC's cross-petition. The issue lying at the threshold of our review of the case is whether the trial court lost jurisdiction over the case when it entered its order setting aside the verdict entered at the first trial. If the Hills prevail on that point, the issues relating to the doctrine of preemption and defamation instructions are moot. If, as the Court of Appeals determined, the trial court had jurisdiction to order a new trial, then we must consider whether its decision to grant the new trial was correct, and if not, we must consider the ramifications. Finally, we must consider whether the Court of Appeals correctly affirmed the trial court's award of attorneys' fees and post-judgment interest.

### III. THE TRIAL COURT HAD JURISDICTION TO ENTER THE ORDER OF AUGUST 8, 2003

■ The Hills argue that the Judgments of May 12, 2003, based on the jury verdicts of the first trial, must be reinstated because by the time the trial court entered the "Order and Opinion" of August 8 setting aside the Hills' favorable jury verdicts and granting KLC a new trial, it no longer had jurisdiction. The

Court of Appeals concluded otherwise. We agree, and accordingly affirm that portion of the Court of Appeals opinion.

The issue arises because of a mistake that occurred soon after the return of the jury verdicts in the first trial. KLC tendered to the trial court a proposed final judgment which grossly understated, and therefore misrepresented, the amounts awarded by the jury at trial.[2] The trial court mistakenly entered the faulty judgment. Thus, the Hills found it necessary to move the court to set aside or amend the defective judgments and enter ones that reflected the true verdict. KLC moved to vacate the judgment and to grant a new trial, asserting the substantive grounds mentioned above. Several months later, on May 12, 2003, the trial court entered two orders (one pertaining to Kim's claims, and one pertaining to Robert's claims) vacating the defective judgment and directing the entry of new judgments properly reflecting the jury verdicts. The orders also stated, "It should be noted that these Judgments are not final and appealable and are subject to further rulings on the motions currently pending to alter, amend, or vacate." Entered with each order was a judgment consistent with the trial verdict; one captioned "Final Judgment in Favor of Kimberly G. Hill," and one captioned "Final Judgment in Favor of Robert W. Hill." Both were signed by the trial judge as entered on May 12, 2003. Except for the word "final" in the caption, neither of the two judgments contained language designating it as a final and appealable order. No further motions challenging the May 12 Judgments were filed.

On August 8, 2003, the trial court entered an order setting aside the jury ver-

---

**2.** There is no evidence that the erroneous judgment was intended to perpetrate a fraud on the court or was otherwise intentionally misleading. We operate under the assumption that the mistake was innocent human error.

dicts in favor of the Hills and granting the motion KLC had filed for a new trial following the entry of the erroneous judgment.

The main thrust of the Hills' argument may be fairly restated as follows. CR 50.02, CR 52.02, and CR 59 all prescribe a ten-day window following the entry of a judgment within which a party may move to challenge the judgment, or within which the trial court may, of its own volition, amend or vacate a judgment. Otherwise, the judgment becomes final. CR 73.02(1) provides that, in the absence of such a motion, a notice of appeal must be filed within thirty days after the date of notation of service of the judgment, or it becomes final. Thus, the only events that delay the finality of a judgment are those described in CR 50, CR 52, or CR 59, or the filing of a notice of appeal under CR 73. Because none of those events occurred after the entry of the May 12 Judgments, the Hills contend they became final well before August 8, 2003, when the trial court vacated the May 12 Judgments. Under that reasoning, it follows that the trial court had lost jurisdiction over the case when it voided the jury verdicts from the first trial and ordered the new trial.

Because we affirm the Court of Appeals on this issue, and agree with its reasoning, we quote from its opinion verbatim:

> [T]he judgments entered on May 12, 2003, were not final because they were attached to an order which specifically stated that "these Judgments are not final and appealable and are subject to further rulings on the motions currently pending to alter, amend or vacate." The order specifically reserved for future adjudication the trial court's ruling on KLC's January 31, 2003, "Amended Motion for JNOV; Motion for New Trial and/or Motion to Alter, Amend or Vacate."

CR 54.01 defines a final judgment as follows:

> A judgment is a written order of a court adjudicating a claim or claims in an action or proceeding. A final or appealable judgment is a final order *adjudicating all the rights of all the parties in an action or proceeding,* or a judgment made final under Rule 54.02. Where the context requires, the term "judgment" as used in these rules shall be construed "final judgment" or "final order". (Emphasis added).

"[I]f an order entered in a cause does not put an end to the action, but leaves something further to be done before the rights of the parties are determined, it is interlocutory and not final." *Hubbard v. Hubbard,* 303 Ky. 411, 197 S.W.2d 923, 924 (Ky.1946). As the trial court's May 12, 2003, order left something further to be done (i.e., to rule on KLC's pending motions), the attached judgments were not final judgments. Simply put, at the time the judgments were entered, all the rights of all the parties had not been adjudicated. Accordingly, the principle that a trial court loses its jurisdiction ten days following the entry of the final judgment is not applicable. The judgments were not final. Similarly, the 30–day period for filing an appeal to this Court pursuant to CR 73.02 did not begin to run. It follows that the trial court retained jurisdiction to enter the August 8, 2003, order and that the order was not "null and void" as asserted by the Hills.

Because the issues raised in those motions were not resolved by the trial court when it corrected the defect as to the verdict amounts, it was within the discretion of the trial court to deny finality to the judgment under CR 54.02, which in relevant part states:

[T]he court may grant a final judgment upon one or more but less than all of the claims ... upon a determination that there is no just reason for delay. The judgment shall recite such determination and shall recite that the judgment is final. In the absence of such recital, any order or other form of decision, however designated, which adjudicates less than all the claims or the rights and liabilities of less than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is interlocutory and subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

We do not overlook the Hills' contention that the motions upon which the August 8 Order was entered were filed *before* the entry of the May 12 Judgments. We decline to decide whether our Rules of Civil Procedure authorize the filing of such motions before entry of the judgment, or whether filing a motion to set aside a judgment prior to the entry of the judgment falls within the ten-day window our Rules provide, because that is not what happened here. A judgment, albeit a faulty one, was entered in January 2003 and KLC filed motions to vacate it in a timely manner. The trial court had discretion to resolve one issue (the error in the amount of the verdict) and reserve others for further consideration. It was within the trial court's discretion to consider KLC's pending motions without requiring them to be re-filed after entry of the May 12 Judgments. We do not share the Hills' concern that this ruling destroys the finality of judgments.

Finally, we note the Hills' argument that, "[KLC] ... should not be allowed to attack its own judgment" and that the motions KLC filed to set aside the defective judgment should not be allowed to be "transferred" to the May 12 Judgments. We appreciate the frustration implied in that argument. The tender of the defective judgment added a very complex dimension to an already complicated case. But, the defective judgments are not KLC's "own." Regardless of how or by whom the judgments were tendered, the entry of the judgment is the trial court's responsibility, and the error contained in the judgment is an error of the trial court. By tendering the defective judgments, KLC did not waive its right to seek relief in the form of a motion for a new trial or a judgment notwithstanding the verdict.

While, as we state below, we disagree with the trial judge's ruling on the substantive issues presented in KLC's post-trial motions, we do not fault his effort to resolve the post-trial procedural problems in a fair and reasonable manner, consistent with the Rules of Civil Procedure.

Having determined that the trial court had not lost jurisdiction when it entered the August 8, 2003 Order setting aside the trial verdict and judgment of May 12, 2003, we must now consider whether the Court of Appeals correctly addressed the merits of the issues raised therein. Two issues presented by that Order are now before this Court.[3] First, the trial court set aside the jury verdict and granted a new trial because it concluded that the wrongful discharge in violation of public policy claims were preempted by the civil rights claims, and should not have been submitted to the jury. Second, the trial court held that it

---

**3.** A third issue ruled on by the trial court is not before us. The trial court did not set aside the determination that KLC was liable on the civil rights claim, thus that determina-

tion became final. It did set aside the damages awarded on that claim, and ordered that the issue of damages, both punitive and compensatory, be subjected to a new trial.

had erred when it ruled that KLC was not entitled to a jury instruction on the defense of "qualified privilege." We turn now to those issues, as they have been presented to us.

## IV. THE HILLS' COMMON LAW WRONGFUL DISCHARGE CLAIMS WERE NOT PREEMPTED BY KRS CHAPTER 344

■ The Hills argue that the Court of Appeals erred in holding that the doctrine of preemption required affirming the decision to set aside the jury verdict in the first trial. KLC argues that the Hills' claims for common law wrongful discharge were preempted by their claims for retaliatory discharge under KRS Chapter 344, Kentucky's Civil Rights Act, that the trial judge correctly ruled as such, and the Court of Appeals correctly affirmed that conclusion. We agree with the Hills, and therefore we reverse.

Both sides in this case, and the Court of Appeals, place a heavy emphasis on our decision in *Grzyb v. Evans*, 700 S.W.2d 399 (Ky.1985). However, KLC's argument (as well as the Court of Appeals' holding) that the civil rights claims preempt the common law discharge claims because "both claims arose out of the same set of facts" and are "predicated on the same conduct by KLC,"[4] indicates a misunderstanding of *Grzyb* as it relates to the doctrine of preemption. *Grzyb* does not hold that preemption is triggered when the same set of facts that establishes a common law wrongful discharge claim also constitutes a claim under KRS Chapter 344. Further explanation of our holding in *Grzyb* is in order, but first we undertake a brief overview of the development of the tort of wrongful discharge in violation of public policy.

The tort of wrongful discharge of a "terminable-at-will" employee is a relatively recent development, having arisen out of carefully crafted exceptions to the common law doctrine that "an employer may discharge his at-will employee for good cause, no cause, or for a cause that some might view as morally indefensible." *See Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 731 (Ky.1984) (citing *Production Oil Co. v. Johnson*, 313 S.W.2d 411 (Ky.1958) and *Scroghan v. Kraftco Corp.*, 551 S.W.2d 811 (Ky.App.1977)).

In *Pari–Mutuel Clerks' Union v. Kentucky Jockey Club*, 551 S.W.2d 801 (Ky. 1977), this Court recognized an exception to the "terminable-at-will" doctrine, and provided a cause of action for wrongful discharge to a worker who claimed he was discharged for engaging in lawful union activity under KRS Chapter 336. *Firestone* provided a similar exception where the termination was motivated by a desire to punish an employee for "seeking benefits to which he is entitled by law," specifically, workers' compensation. *Firestone*, 666 S.W.2d at 734.

We recognized in *Firestone* that, although the "terminable-at-will" doctrine should be retained, "a narrow public policy exception should be adopted" when the firing of an employee undermined a "most important public policy." *Id.* To insure that the tort of wrongful discharge developed in a "clearly defined and suitably controlled" manner, we adopted the rule described in *Brockmeyer v. Dun & Bradstreet*, 113 Wis.2d 561, 335 N.W.2d 834, 840 (1983), and established for Kentucky the following limitations on conditions under which exceptions to the "terminable-at-will" doctrine would give rise to a wrongful discharge claim:

---

**4.** The "same set of facts" referred to is, specifically, the alleged insistence by KLC that Kim commit perjury at the unemployment compensation hearing of Gilmore.

1) The discharge must be contrary to a fundamental and well-defined public policy as evidenced by existing law.

2) That policy must be evidenced by a constitutional or statutory provision.

3) The decision of whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact.

*Firestone,* 666 S.W.2d at 731.

Sensing "that there was some misunderstanding of the meaning of our decision" in *Firestone,* we granted discretionary review in *Grzyb.* Our decision in *Grzyb* made two important points. First, it refined the parameters set out in *Firestone* for recognizing new public policy exceptions to the "terminable-at-will" doctrine. Second, it explained the circumstances in which the doctrine of preemption would block the creation of a common law claim for wrongful discharge in violation of public policy.

In *Grzyb,* an employee named Evans alleged that he had been discharged from his employment for fraternizing with a female employee. Evans brought suit against his corporate employer and his individual supervisors, asserting a claim for common law wrongful discharge in violation of public policy and for violation of his civil rights under KRS 344.040, both based on sexual discrimination. The employer successfully argued that Evans's common law wrongful discharge claim was preempted by the statutory remedies afforded under KRS Chapter 344 for civil rights violations. The reason for the preemption, however, was not that Evans's sex discrimination claim under KRS 344.040 was based on the *same conduct* as his common law wrongful discharge claim. Preemption was based on the fact that his sex discrimination claim was based on the *same law* as his wrongful discharge claim. *Grzyb,* 700 S.W.2d at 401–402. The only "fundamental and well-defined public poli-

cy" that Evans could articulate to meet the requirement for a wrongful discharge claim was the very same public policy embodied in the civil rights statutes of KRS Chapter 344. We held in *Grzyb* that Evans' had no wrongful discharge claim because:

> [T]he claim of sex discrimination would not qualify as providing the necessary underpinning for a wrongful discharge suit because the *same statute* [KRS 344.040] that enunciates the public policy prohibiting employment discrimination because of 'sex' also provides the structure for pursuing a claim for discriminatory acts in contravention of its terms. See KRS Chapter 344, Civil Rights.
>
> [...] Thus, the same statute which would provide the necessary underpinning for a wrongful discharge suit where there is sufficient evidence to prove sex discrimination in employment practices also structures the remedy. The statute not only creates the public policy but preempts the field of its application.

*Grzyb,* 700 S.W.2d at 401 (emphasis added).

"Where the statute both declares the unlawful act and specifies the civil remedies available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute." *Id.* (internal citations omitted). Thus, preemption is not caused exclusively by the similarity of the *facts* that underlie the respective causes of action. In the context of a wrongful discharge case, preemption occurs when the statutes that establish the "well-defined public policy" violation which supports the wrongful discharge pleading are the same statutes that establish a statutory cause of action for, and structure the remedy for, violations of that public policy.

As an additional aid to the further development of the law of wrongful discharge,

we identified in *Grzyb* the only situations in which discharging an at-will employee would be so contrary to public policy as to be actionable despite the absence of "explicit legislative statements prohibiting the discharge." *Id.* at 402 (quoting *Suchodolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 316 N.W.2d 710, 711 (1982)). Those situations are:

> 1) Where the alleged reason for the discharge of the employee was the employee's failure or refusal to violate a law in the course of employment; or
>
> 2) When the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment.

*Id.* at 402.

The Hills assert in their pleadings that they were fired from their jobs at KLC because of "Kim Hill's refusal to offer false testimony during a legal proceeding." Thus, the "fundamental and well-defined public policy"[5] invoked by the Hills as the underpinning of their wrongful discharge claims is the public policy against false testimony in a legal proceeding. We need not cite every constitutional or statutory provision embracing that public policy as it suffices to note as a matter of law that KRS Chapter 523, *Perjury and Related Offenses*, provides a clear, strong legislative expression of public policy against perjury.[6] We note further that discharging the employee for refusal to violate a

law is one of the two situations we cited in *Grzyb* as being so contrary to public policy as to be actionable as wrongful discharge. On the other hand, the underpinning of the Hills' civil rights claim was retaliation for testifying in support of a civil rights complaint by a co-worker—not violation of the perjury statutes. Thus, the Hills asserted an appropriate claim for wrongful discharge based on the laws against perjury.

And in fact, our Court of Appeals has already determined that a wrongful discharge claim will lie under such circumstances. *Northeast Health Management, Inc. v. Cotton*, 56 S.W.3d 440 (Ky.App.2001)(holding that discharging an employee for refusing employer's request to commit perjury satisfied the first of the two situations described in *Grzyb*, and therefore qualified as an exception to the terminable-at-will doctrine). In *Cotton*, no claim under KRS Chapter 344 was asserted. *Cotton*, therefore, is significant to our analysis here because it clearly demonstrates that a claim of wrongful discharge for refusing to commit perjury does not depend upon the same public policy embodied in KRS Chapter 344 for its "necessary underpinning." In other words, unlike the sex discrimination based claims asserted in *Grzyb*, the Hills' claims for wrongful discharge do not arise from and do not depend upon the same statutes as their civil rights claims.[7]

---

**5.** The first prong of the *Firestone* test is that the termination of employment conflicted with a fundamental and well-defined public policy. *Firestone*, 666 S.W.2d at 731.

**6.** The second prong of the *Firestone* test is that the public policy be evidenced by a statutory or constitutional provision. *Firestone*, 666 S.W.2d at 731.

**7.** KLC cites *Wilson v. Lowe's Home Center*, 75 S.W.3d 229 (Ky.App.2001), *Kroger v. Buckley*, 113 S.W.3d 644 (Ky.App.2003), and *McBrear-*

*ty v. Kentucky Community and Technical College System*, 262 S.W.3d 205 (Ky.App.2008) as cases in which a common law claim was preempted because it was based on the "same facts" as a civil rights claim. Although none of those cases involved wrongful discharge claims, each is *Grzyb*-type preemption because the only statutory or constitutional law proscribing the offensive conduct sustaining the common law claim was KRS Chapter 344, the civil rights statutes. It is the common legal underpinning, not the common conduct that triggers preemption.

Because, the statutes that declare the unlawful act of perjury are not the same statutes that declare and remedy civil rights violations, the Hills' claims under KRS Chapter 344 does not preempt the Hills' common law claims for wrongful discharge based on the public policy against perjured testimony. To further illustrate the distinct legal nature of the two claims, this Court notes that if KLC had requested Kim Hill to testify falsely regarding her co-worker, Gilmore, and she had refused but also did not affirmatively testify on Gilmore's behalf, any subsequent termination would potentially give rise to a common law wrongful discharge claim but not an action under KRS Chapter 344. Similarly, had KLC never approached Kim Hill about her testimony in the Gilmore matter and the only conduct at issue was her eventual testimony on his behalf, a KRS Chapter 344 claim could be stated upon termination but there would be no basis for a common law wrongful discharge claim, i.e. no request for perjured testimony. In this case, the jury apparently found that both things occurred: KLC requested perjured testimony and Kim Hill affirmatively exercised her right to testify in support of a co-worker's discrimination claim. Thus, the conduct at issue here gave rise to two distinct causes of action.

■ The trial court erred in its order of August 8, 2003, and misapplied *Grzyb*, when it held otherwise.[8] The Court of Appeals erred when it applied the doctrine of preemption to eliminate the Hills' wrongful discharge claim. The jury was properly instructed on each claim. We therefore reverse the opinion of the Court of Appeals to the extent that it affirmed the trial court's August 8, 2003 Order setting aside the jury verdict on the Hills' claims for wrongful discharge in violation of public policy, and direct that the original verdicts on those claims be reinstated.

## V. THE TRIAL COURT ERRED IN SETTING ASIDE THE JURY'S VERDICT WITH RESPECT TO THE DEFAMATION CLAIM

In its August 8, 2003 Order, the trial court sustained KLC's motion for a new trial on the defamation claims, concluding that it had "erred in ruling that [KLC] did not have a qualified privilege under the circumstances of this case." The jury instructions on defamation given at the second trial included the defense of qualified privilege, and the jury returned a verdict in favor of KLC.

Both parties have raised issues relating to the defense of privilege, both absolute and qualified. KLC argues in its cross appeal, as it did in its motion at the first trial for a directed verdict, that its conduct in relation to the termination memo is subject to *absolute* privilege for two reasons: 1) the document was disclosed pursuant to a requirement of the law; and 2) the document was a communication of a government official performing his statutory duties. The Hills argue that *absolute* privilege does not apply here, and that setting aside the first trial verdict was error because KLC had not properly raised and preserved the defense of *qualified* immunity. The Court of Appeals found that "KLC was entitled to a qualified privilege instruction, and the trial court did not abuse its discretion by granting KLC a new trial on the issue." It

8. The trial court erred further in that order when it stated that the wrongful discharge claim should have been submitted to the jury "only as alternative claims to be considered" only if the jury found in favor of KLC on the civil rights claim. When preemption is properly applied, the common law claim is subsumed and eliminated by the overriding statutory scheme, and the remedy, if there is to be one, may only be found under the statute.

declined to address KLC's argument that its privilege was absolute.[9]

We now consider the issues regarding privilege.

### A. KLC's Claim of Absolute Privilege

■ The existence of an absolute privilege is a question of law, to be determined by the trial judge, not the jury. *Rogers v. Luttrell*, 144 S.W.3d 841, 844 (Ky.App. 2004). In *Compton v. Romans*, 869 S.W.2d 24, 26 (Ky.1993), this Court recognized that historically "the class of absolutely privileged communications are [sic] comparatively few, and that the courts have evinced a purpose not to extend that class." *See also McAlister & Co. v. Jenkins*, 214 Ky. 802, 284 S.W. 88, 90 (1926). Specifically, it was noted in *McAlister*:

> If in the discharge of a duty imposed by law a public official clothed with quasi judicial powers may have suspended over his head continually the threat of libel suits, it is apparent that his official conduct would be tempered by and tainted with the fear that he might be unjustly subjected to such actions. The policy of the law is therefore, and the reason of the rule is, that, although upon rare occasions judges and other public officials upon whom are imposed by law judicial or quasi judicial duties may maliciously slander or calumniate in the exercise of their authority, it is better that they should be protected upon such occasions by this absolute privilege than

that the great body of such officials in the conscientious exercise of their duties should be hampered continually by the threat of such civil actions.

*Id.* at 90–91. *McAlister* then extended the doctrine of absolute immunity to include libelous communications of certain "heads of executive departments, provided the libelous communication is pertinent to the inquiry under investigation at the time," and where the administrative body was "charged with the exercise of quasi judicial powers and the duty imposed upon its membership to take certain action after exercising those quasi judicial functions." *Id.* at 91. In *Compton*, we stated, "[t]o determine the extent to which a public official shall have protection of the doctrine of absolute immunity, it is necessary to examine the lawful authority including such discretionary authority as may be reasonably implied, and the action taken which gives rise to the defamation claim." *Compton*, 869 S.W.2d at 27. We then decided that the Chairman of the State Racing Commission, for statements made in the performance of his duties, should enjoy an absolute privilege from defamation suits, because, "[t]o facilitate implementation and fulfillment of the statutory purpose, the State Racing Commission was given broad rule-making, enforcement and adjudicatory authority." [10]

■ In *McAlister* and *Compton*, we recognized that the defense of absolute privilege extends to executive officers of administrative agencies exercising quasi-judicial

---

9. The Court of Appeals declined to address KLC's claim of absolute privilege, deeming it moot, but since the existence of an absolute privilege would bar retrial on the issue altogether, its opinion that the retrial was required necessarily implies the rejection of an absolute privilege.

10. Under KRS 230.215(2), the State Racing Commission was granted "forceful control of thoroughbred racing" and "plenary power to

prescribe rules, regulations and conditions" for such racing and wagering thereon, and was directed to regulate thoroughbred race meetings "free of any corrupt, incompetent, dishonest or unprincipled" practices and to regulate such racing "so as to dissipate any cloud of association with the undesirable and maintain the appearance as well as the fact of complete honesty and integrity" of thoroughbred racing in Kentucky.

and regulatory authority. KLC contends that its officers should fall within that extension, reminding us that in *Matthews v. Holland*, 912 S.W.2d 459 (Ky.App.1995), the Court of Appeals held that the absolute privilege for executive officers extended to a county school superintendent. The Court in *Matthews* offered no explanation as to how school superintendents' duties and responsibilities compared with the kind of quasi-judicial authority identified in *Compton* and *McAlister*, and we therefore decline to endorse it here. The record before this Court does not establish that the KLC employees responsible for the termination memo were "heads of executive departments" charged with quasi-judicial authority, and the kind of broad rule-making, enforcement and adjudicatory authority needed to overcome our historical reluctance to expand the sphere of absolute privilege. We do not regard them as having absolute privilege or immunity from defamation claims. We also note, as described below in our discussion of post-judgment interest, the legislature expressly distanced KLC from the offices of state government by designating it as "an independent, de jure municipal corporation." KRS 154A.020.

■ KLC next argues that its conduct with respect to the termination memo is absolutely privileged because it was required by the Open Records Act to release the memo when WLKY requested it. "One who is required by law to publish defamatory matters is absolutely privileged to publish it." Restatement *(Second) of Torts*, § 592A (1977). It is conceded that KRS 154A.020(1) renders KLC subject to the Open Records Act, KRS 61.870 *et seq.* We have been directed to no prior decisions respecting the degree of privilege to be accorded defamatory matters disclosed pursuant to an open record request. *Palmer v. Driggers*, 60 S.W.3d 591 (Ky.App.2001) supports KLC's argument that personnel records of employees of public agencies are subject to disclosure under a formal open record request, and that those responsible for complying with the Open Records Act may be compelled to release information that proves embarrassing or humiliating to public employees. As noted in *Palmer*, the Act provides several exemptions which the affected individuals may invoke to protect their privacy interests, and a process for determining on a case-by-case basis whether the public interest in the disclosure, reflected in the Act outweighs the personal, privacy interest embodied in the various exemptions. We agree that an officer required by law to make a disclosure should not be held liable for having done so. But, the Hills' complaints allege more than the simple disclosure of documents prepared in the regular course of business, and placed in their personnel files. They presented evidence to show that their KLC supervisors maliciously created the defamatory memoranda so that they would be subject to an open records disclosure, and concealed the existence of the documents to impede the Hills' ability to invoke an exemption to the Open Records Act.

■ While we agree with the *Restatement* that "one who is required by law to publish defamatory matter is absolutely privileged to publish it," we also agree that the absolute privilege does not extend so far as to cloak with immunity one who, with a malicious purpose and under no legal compulsion to do so, creates defamatory material with the expectation that it would be published. Under the circumstances alleged by the Hills, KLC would have no more than a qualified privilege, to be considered by the jury based on evidence presented at trial. We conclude that the trial court correctly rejected KLC's claim of absolute privilege.

*B. KLC'S Claim of Qualified Privilege*

 In his August 8, 2003 Order, the trial judge decided that he erred by failing to instruct the jury on qualified privilege, and that a new trial on the issue of defamation was required. We disagree. The judge did not err in failing to so instruct the jury because KLC did not adequately or properly raise the issue. CR 51(3) provides:

> [n]o party may assign as error the giving or the failure to give an instruction unless he has fairly and adequately presented his position by an offered instruction or by motion, or unless he makes objection before the court instructs the jury, stating specifically the matter to which he objects and the ground or grounds of his objection.

In its pretrial motion for summary judgment and its motion for a directed verdict, KLC argued for dismissal of the defamation claim on the grounds of *absolute* privilege, which as noted previously, does not allow for a jury instruction. *Rogers,* 144 S.W.3d at 844. As noted in the preceding section of this opinion, the trial judge correctly and consistently ruled that no absolute privilege applied here. In seeking an instruction on qualified privilege, it was incumbent upon KLC to fairly and adequately present the matter to the court. It is equally important that the issue be fairly and adequately presented to the opposing parties, whose interest in avoiding reversible error is paramount. Our review of the record persuades us that KLC did not fairly and adequately present its position on qualified privilege to the trial court's attention by tendering an appropriate jury instruction, or otherwise, and therefore, KLC was not entitled to a new trial.

We addressed virtually the same issue in *Meyers v. Chapman Printing Co., Inc.,* 840 S.W.2d 814 (Ky.1992). There, a party objected to a jury instruction that used the words "but for" as the causal link between the alleged wrongful conduct and the injury claimed. We stated:

> [a]lthough Meyers objected to the "but for" language, Meyers tendered no instruction fully describing her view of how to properly frame the same issue. She contends that once she objected and asked that "substantial or motivating" factor language be used instead of "but for," the burden was on her opponent, the employer, to complete the record by submitting a further instruction advising the jury that it should nevertheless find for the employer if they believed the employee would have been discharged even if no improper motive existed. *The requirements of CR 51(3) are such that before a party may complain of error in the instructions, the party must accompany the objection with a fully correct instruction, or, at the least, must advise the court sufficiently so that the court can understand both the nature of the objection and what needs to be done to correct it*

*Id.* at 823–824 (emphasis added).

In *Sand Hill Energy, Inc. v. Smith,* 142 S.W.3d 153, 163 (Ky.2004) we provided a clear rule to determine compliance with CR 51(3), stating:

> Kentucky appellate courts have explained that a tendered instruction will not fairly and adequately present the party's position as to an allegation of instructional error when:
>
> (1) the omitted language or instruction was not contained in the instruction tendered to the trial court; i.e., when the allegation of error was not presented to the trial court at all;
>
> (2) the minor differences between the language of the tendered instruction and the instruction given by the trial court

would not call the trial court's attention to the alleged error;

(3) the tendered instruction itself was otherwise erroneous or incomplete.

*Id.* at 163–164 (internal citations omitted).

The specific issue in *Sand Hill* was whether the one party, Ford Motor Company, had preserved its claim that the punitive damage instructions given to the jury failed to satisfy the extra-territorial limitation on punitive damages imposed by the United States Supreme Court in *State Farm Mutual Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). We concluded that, while it would have been improper to give Ford's entire four-page punitive damage instruction, one paragraph did contain the language essential to a correct instruction. We concluded that the tendered instruction satisfied all the elements set out in *Sand Hill.* The instruction on privilege tendered by KLC [11] satisfied none of *Sand Hill's* three factors for CR 51(3) compliance, and stands in marked contrast to the one it tendered at the second trial.[12] KLC failed the *Meyers* test because it did not "accompany the objection [as to the privi-

lege instruction] with a fully correct instruction," nor did it "advise the court sufficiently so that the court [could] understand both the nature of the objection and what need[ed] to be done to correct it."

We conclude that KLC did not comply with CR 51(3), and therefore was not entitled to demand a new trial on alleged errors that it failed to bring to the trial court's attention in an adequate and timely manner. Instead of properly demanding an instruction on *qualified* privilege, KLC continued to assert the defense of *absolute* privilege. KLC's compliance with CR 51(3) at the end of a three-week jury trial would have not only allowed the trial court to fairly evaluate the matter, it would have enabled the Hills to protect their interest in avoiding the need for a second trial. By granting KLC a new trial despite its violation of CR 51(3), the trial court abused its discretion. We therefore reverse the judgment of the second trial, and reinstate the verdicts reflected in the Judgment of May 12, 2003.

## VI. POST–JUDGMENT INTEREST

KRS 360.040 directs that a judgment "shall bear twelve percent (12%) interest

---

**11.** The instruction tendered by KLC at the first trial read, in pertinent part:

> In order for the Hills to recover on their claim of defamation against the Lottery, they must prove by a preponderance of the evidence that:
> One: That the accusations against the Hills in the termination memorandum were False;
> Two: That the termination memorandum produced to the television station would tend to expose the Hills to public hatred, ridicule, contempt, disgrace, or induce an evil opinion of the Hills to the community;
> Three: That the Lottery did not exercise ordinary care to determine whether or not the statements contained in the termination memorandum were true;
> Four: That as a direct result of such statements the Plaintiffs' reputations were damaged; and

> Five: That the Lottery was not privileged in producing the memorandum.

**12.** At the second trial, KLC tendered this instruction:

> The Lottery had a privilege to produce the termination memorandum to WLKY pursuant to the Kentucky Open Records Act. Therefore, in order to find in favor of Kimberly Hill, you must also find the following:
> a) The Lottery was not acting in good faith and in reliance upon what it believed to be true and was not acting in furtherance of its business and confidentiality as circumstances permitted, *and*
> b) The Lottery acted with malice in that it (i) specifically intended to subject Kimberly Hill to cruel and unjust hardship, (ii) specifically intended to cause tangible or intangible injury to Kimberly Hill.

compounded annually from its date." However, it also allows the trial court to set a lesser rate of interest on judgments for unliquidated damages, if "after a hearing on that question" the trial court "is satisfied that the rate of interest should be less." The trial court fixed the rate of interest on the judgment at 6%.

KLC argues, as it did in the trial court and the Court of Appeals, that because KRS 154A.020 created KLC as a "political subdivision of the Commonwealth," it may not be held to pay interest on judgments, citing *Powell v. Board of Educ. of Harrodsburg*, 829 S.W.2d 940, 941 (Ky.App. 1991):

> [i]t is a well-settled principle that neither a state nor public agency is liable for interest on public debts unless there is statutory authority or a contractual provision authorizing the payment of interest. . . . Authority for this view comes from § 231 of our Kentucky Constitution which reads, "The General Assembly may, by law, direct in what manner and in what courts suits may be brought against the Commonwealth."

(Internal citations omitted).

■ Based upon the premise that KRS 154A.020 also establishes KLC as "an independent, de jure municipal corporation," the Court of Appeals held that KLC was liable for interest on judgments entered against it. It noted the equally well-established principle, reiterated in *Kentucky Center for the Arts Corp. v. Berns*, 801 S.W.2d 327 (Ky.1990), that municipal corporations do not enjoy sovereign immunity and reasoned that the General Assembly's designation of KLC as a municipal corporation clearly indicates that the legislature did not intend to cloak KLC with immunity from suit, or from interest on judgments. We read further verification of that reasoning in the language of KRS 154A.020 stating, "The General Assembly hereby

recognizes that the operations of a lottery are unique activities for state government and that a corporate structure will best enable the lottery to be managed in an entrepreneurial and business-like manner." Accordingly, we affirm the Court of Appeals' opinion that as a municipal corporation, KLC has no sovereign immunity to exempt it from the assessment of interest under KRS 360.040.

■ The Hills contend that the trial court failed to hold the "hearing" referred to in KRS 360.040 before it reduced the applicable rate of interest to 6%. We do not construe the statute's requirement for a "hearing" to mean more than the basic notion that before the Court undertakes to consider the question, an opportunity will be provided to present one's position on the matter, and an opportunity will be provided to refute the opponent's position. Our review of the record discloses that, following the second trial, KLC made a CR 59 motion which included an objection to the assessment of interest and in the alternative, a request to set an amount lower than 12%. The Hills had an ample opportunity to respond, and in fact, did submit a written response. We are satisfied that the trial court complied with KRS 360.040, and that he did not abuse his discretion in fixing the rate of interest on the judgment at 6%.

## VII. ATTORNEY FEES

Both parties acknowledge that KRS 344.450 entitles the Hills to recover reasonable attorney fees for their claims under KRS Chapter 344. Following the second trial, the Hills submitted a motion for attorney fees in the sum of $451,529.74. The request was based upon time sheets showing that a total of 2598.95 hours was spent on the case, and multiplying those hours by an hourly rate assigned to the attorneys and their staff assistants who

worked on the case. Hourly rates of the attorneys varied between $175 and $200 per hour. The Hills agreed later that their request should be reduced by $1507.50, resulting in a demand of $450,022.24. Because the jury at the second trial found against the Hills on the defamation claims and awarded damages only for the civil rights retaliation claims, the trial court reasoned that it should award attorney fees of one-half of the requested amount, or $225,011.12. The judge also concluded that an additional $12,051.25 of the request was not justifiably attributable to KLC, so the final amount awarded was $212,959.87.

The trial judge recognized that in *Meyers*, 840 S.W.2d 814, we recognized the "lodestar" method prescribed in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) as the approved means of determining a reasonable attorney fee award in civil rights cases. As shown by his reference to *Meyers*, the trial judge knew that "the court should not undertake to adopt some arbitrary proportionate relationship between the amount of the attorney fees and the amount awarded." *Meyers*, 840 S.W.2d at 825.

■ We understand the difficult challenge trial judges face in balancing the myriad of complex factors involved in awarding attorney fees in a civil rights case. There is no mathematically precise answer, but that is exactly what the trial judge tried to find when he divided the requested fee in half, to allocate one-half to the attorneys' efforts in the defamation claims and the other half to the civil rights claims. However, that was done with no consideration of the actual time and effort expended on the different claims, or consideration of the time and effort common to all the claims. It is inconceivable that proper representation of the Hills for one cause of action required only one-half of the time, talent, and effort expended to represent them on both the civil rights claims *and* the defamation claims.

The fact that all the claims were, as the trial judge stated, "somewhat interrelated" militates against his award because it suggests that much of what was done in support of the defamation claims had to be done anyway if only the civil rights claims were involved. Splitting the fee equally between the two causes of action ignores that reality, and does not represent a true effort to place a value on the services rendered by the attorneys to vindicate the civil rights violations. It undervalues the financial burden of pursuing a civil rights violation by allocating a part of that burden to other claims that may be joined with the civil rights violation in a common law suit.

We therefore remand the issue of attorney fees to the trial court, with directions to award a fee that reasonably values the legal services expended to prevail on the civil rights claims, regardless of the other claims with which the civil rights claims were joined.

## VIII. THE PUNITIVE DAMAGE INSTRUCTION

Finally, we address KLC's contention that the award of punitive damages must be vacated and the issue remanded for retrial because the punitive damage instruction authorized an award of punitive damages for Retaliatory Discharge under the Kentucky Civil Rights Act (KRS Chapter 344). We agree that the punitive damage instruction was erroneous. However, because we further believe that the error did not affect the substantial rights of the parties, we conclude the error was harmless and we therefore affirm the original judgment's award of punitive damages.

■ The trial court instructed the jury that it could return a single award of punitive damages to each plaintiff if it found for that plaintiff under any of the three theories of liability,[13] and if it further believed that KLC acted toward that plaintiff "with oppression and malice." Although KLC did not oppose the consolidation of multiple theories into a single punitive damage instruction, it objected to the inclusion of the civil rights claim on the ground that punitive damages could not be awarded for civil rights violations. At the time, we had no case directly addressing the point. Referring to the statute and to the Palmore's Kentucky Instructions to Juries," the trial court overruled KLC's objection. Since then, we decided *Kentucky Dept. of Corrections v. McCullough*, 123 S.W.3d 130 (Ky.2003), and held that KRS Chapter 344 did not authorize punitive damages for a civil rights violation. Therefore, the inclusion of the civil rights claim in the punitive damage instruction was error.

■ The issue having been properly preserved, our next inquiry is whether that error was harmless. Civil Rule 61.01 provides that judgments should not be disturbed for errors that do not affect a party's substantial rights. Because all of the conduct for which the jury might have awarded punitive damages for the civil rights violation was the same conduct for which such damages were properly awarded under the common law wrongful discharge claim, the instructional error was harmless.

KLC relies on *Stringer v. Wal–Mart Stores, Inc.*, 151 S.W.3d 781 (Ky.2004), where jury verdicts for invasion of privacy, intentional infliction of emotional distress (IIED), and defamation were consolidated into a single damage award. On appeal, it was determined that the trial court should have dismissed the invasion of privacy and IIED claims. The only proper compensatory and punitive damages were those resulting from defamation. Damages awarded for conduct constituting invasion of privacy or IIED would have to be set aside. However, because the three claims involving separate and distinct acts of tortious conduct had been combined into a single damage instruction, we found it "impossible to determine what portion, if any, of the jury's compensatory and punitive damage verdicts was attributable to actions on the part of Appellees for which they had no liability to Appellants." *Id.* at 801.

KLC argues that the punitive damages awarded herein must be vacated for the same reason. We disagree. Unlike *Stringer*, where the claims for which Wal–mart had no liability (IIED and invasion of privacy) were distinctly different in character and effect from the surviving claim (defamation), the action on the part of KLC underlying the civil rights claim is exactly the same conduct that established the common law wrongful discharge claim. Because punitive damages were proper under the common law wrongful discharge claim, it is immaterial that the same conduct was also subject to punitive damages as a civil rights violation.

KLC repeatedly confirms in the brief it filed with this Court that the Hill's common law wrongful discharge claim was "[b]ased upon the same facts supporting their [civil rights] claim." The record discloses that the civil rights claim was based on the allegation that KLC terminated the Hill's employment in retaliation for Kim's

---

**13.** As noted previously, the jury found liability and awarded compensatory damages under all three theories: Wrongful Discharge in violation of public policy, Retaliatory Termination under the civil rights act, and Defamation.

truthful testimony in support of Ed Gilmore at Gilmore's unemployment hearing, and that the common law wrongful discharge claim was based on the allegation that KLC terminated the Hill's employment because Kim Hill refused KLC's request that she testify falsely at that hearing.

Regardless of how it is parsed, whether KLC acted as it did because Kim Hill refused to give false testimony against Mr. Gilmore, or because she gave truthful testimony in support of Mr. Gilmore, KLC's conduct—firing the Hills--was the same.[14] And, the motivation for that conduct under either claim was also exactly the same - KLC's disapproval of Kim Hill's testimony. Thus, there is no possibility any part of the punitive damage award was attributable to actions on the part of KLC for which it had no punitive damage liability.[15] In this case, the retaliatory termination civil rights claim and the common law wrongful discharge claim are factually synonymous, and therefore, *all* of the actions of KLC covered by the punitive damage instruction were properly subject to punitive damages.

The inclusion of the civil rights claim in the punitive damage instruction was error, but it could not have affected the punitive damage verdict and, therefore, it amounted to no more than harmless, excess verbiage.

Accordingly, we affirm the judgment with respect to the award of punitive damages.

## CONCLUSION

Based upon the analysis of the issues set forth above, we reverse the opinion of the Court of Appeals and we remand this matter to the Jefferson Circuit Court with directions to enter judgment reinstating the jury verdicts of the first trial, and to reconsider the amount of attorney fees awarded pursuant to KRS 344.450. We affirm the decision of the Court of Appeals as to the interest rate to be applied to the judgment.

ABRAMSON, SCOTT, SCHRODER, JJ. and Special Justice EARL FRANKLIN MARTIN, Jr. and Special Justice MARK C. WHITLOW, concur, except as to Part VIII.

NOBLE, J., concurs in result only by separate opinion.

As to Part VIII, SCOTT, J. and Special Justice EARL FRANKLIN MARTIN, Jr., concur, NOBLE, J., concurs in result only, and ABRAMSON, J., dissents by separate opinion in which SCHRODER, J. and Special Justice MARK C. WHITLOW, join.

MINTON, C.J., and CUNNINGHAM, J., not sitting.

ABRAMSON, Justice, concurring in part and dissenting in part:

I concur in all parts of the majority opinion with the exception of Part VIII,

---

**14.** Both the trial court and the Court of Appeals found that the two claims were based upon the same conduct. KLC argued in the trial court that the damages arising from that conduct are, under either theory of liability, the same. The trial judge noted, "[the Hills'] damages are the same, whether they were terminated for public policy reasons or whether they were terminated for [KRS Chapter] 344 reasons, the evidence of - the damages are the same." To this Court, KLC stated, "the [compensatory] damages for both

claims were the same and [the jury] should award only one set of [compensatory] damages."

**15.** It is not contested that the defamation claim was the proper subject of the punitive damage instruction, and so its inclusion in the combined damage instruction has no effect on the issue of whether the inclusion of the civil rights claim affected the verdict.

regarding punitive damages, from which I respectfully dissent.

### INSTRUCTION NO. 8: PUNITIVE DAMAGES

If you find for Kim [Bob] Hill under Interrogatory No. 1 and / or No. 2 and / or 3, and awarded her [him] a sum of money in damages under either Instruction 5, 6, or 7, and if you are satisfied from the evidence that the Kentucky Lottery acted toward Kim [Bob] Hill with oppression or malice, you may in your discretion, award punitive damages against the Kentucky Lottery in addition to the damages awarded under Instruction No. 5, 6, or 7.

As used in this Instruction oppression means conduct that was specifically intended by the Kentucky Lottery to subject Kim [Bob]Hill to cruel and unjust hardship; and malice means conduct that was specifically intended by the Kentucky Lottery to cause tangible or intangible injury to Kim [Bob]Hill.

If you award punitive damages, in determining the amount thereof, you should consider the following factors: a) the likelihood at the time of such misconduct by the Kentucky Lottery that serious harm would arise from it; b) the degree of the Kentucky Lottery's awareness of that likelihood; c) the profitability of the misconduct to the Kentucky Lottery; d) the duration of the misconduct and any concealment of it by the Kentucky Lottery; and e) the actions by the Kentucky Lottery to remedy the misconduct once it became known to it.

If you award punitive damages, you will state the amount separately from the sum or sums awarded under Instruction No. 5, 6, or 7. The award shall not exceed $1,000,000 (the amount claimed).

This instruction focuses, as Kentucky law requires, on the conduct of the defendant, KLC. According to the preceding jury instructions, KLC's conduct underlying the common law wrongful discharge claim was its "urging" that Kim Hill "give false testimony ... at an unemployment hearing...." As for the retaliatory discharge claim, the jury instructions required the jury to consider the Hills' opposition to what they "believed to be the Kentucky Lottery's violation of Ed Gilmore's civil rights...." This statutory claim focused on Kim Hill's affirmative testimony in support of Gilmore's unemployment claim. While the majority's preemption analysis recognizes the independent nature of these two claims, its punitive damages analysis conflates the two as "factually synonymous." I disagree. While all of the conduct related to the Gilmore matter, there was nonetheless different conduct at different points in time. The request for perjury was weeks before the actual unemployment hearing. The retaliation occurred following Kim Hill's decision to testify affirmatively on Ed Gilmore's behalf in response to what she viewed as unlawful discrimination against Gilmore, who was allegedly disabled.

After *Kentucky Dept. of Corrections v. McCullough*, 123 S.W.3d 130 (Ky.2003), it is black letter law that punitive damages are not recoverable for a violation of the Kentucky Civil Rights Act (KCRA). Thus, the retaliatory discharge claim and the conduct underlying that claim were not properly part of the jury's consideration as to the award of punitive damages. Furthermore, it is impossible to know that the award was not in some measure affected by the improper inclusion of the KCRA claim and, consequently, the error is not harmless. While the majority insists the combined damage instructions criticized in *Stringer v. Wal–Mart Stores, Inc.*, 151 S.W.3d 781 (Ky.2004), are distinguishable, and it was perhaps easier to identify specific distinct acts underlying the three tort

claims in that case, the principle remains pertinent and, in my view, precludes upholding an award pursuant to the erroneous combined instruction. Accordingly, I would remand for a new trial solely on punitive damages.

SCHRODER, J., and Special Justice MARK C. WHITLOW join.

NOBLE, Justice, concurring in result only by separate opinion.

The appellants, Robert and Kim Hill, filed suit against Appellee, the Kentucky Lottery Corporation (KLC), claiming retaliatory termination in violation of the Kentucky Civil Rights Act (KRS 344), common law wrongful discharge, and defamation. KLC sought summary judgment, claiming that the Chapter 344 retaliation claim preempted the common law claim for wrongful discharge, and asserting absolute privilege. The trial court denied summary judgment, and the case proceeded to a three-week jury trial which resulted in a verdict for Appellants on December 18, 2002. Robert was awarded $2,645,450 in compensatory and punitive damages, and Kim was awarded $1,697,866. KLC filed a bare motion under CR 50.02, 59.01 and 59.05 on December 26, 2002. At the same time, KLC submitted a judgment purportedly reflecting the jury verdict, which the trial court entered on January 23, 2003.

However, the judgment prepared by KLC contained substantially erroneous amounts for the damages awards. This forced the Hills to file a motion to vacate the erroneous judgment on January 23, 2003. On January 31, 2003, KLC filed an "Amended Motion for Judgment Notwithstanding the Verdict, Motion for New Trial and Motion to Alter, Vacate or Amend the Judgment." On May 12, 2003, the trial court granted the Hills' motion to vacate and entered "final" judgments for each which were consistent with the verdict.

They were accompanied by a separate order which included the following language: "It should be noted that these Judgments are not final and appealable and are subject to further rulings on the motions currently pending to alter, amend, or vacate." KLC did not file a new motion to alter, vacate or amend, nor did it file a notice of appeal within the thirty days following the entry of the May 12 judgment. At that point, the Hills had no reason to appeal, having prevailed on all their claims.

On August 8, 2003, the trial court ruled on the "pending" motions, denying the JNOV motion, but nevertheless ruling in favor of KLC on three grounds: the defamation jury instructions erroneously did not include the defense of qualified privilege; KLC was entitled to preemption on the wrongful discharge claim; and KLC was entitled to a retrial of the damages award on retaliation and punitive damages. Both parties appealed this ruling, but the Court of Appeals dismissed the appeals as interlocutory.

At the second trial, KLC prevailed on the defamation claim, and the damages award for the Hills was much lower. Post-trial, the trial court awarded attorneys' fees to the Hills in the amount of $212,959.87, and fixed post-judgment interest at 6%. Both parties appealed to the Court of Appeals, which affirmed the trial court's judgment in the second trial. We granted discretionary review to consider the question of whether the trial court had lost jurisdiction of the case after it entered an amended judgment from which no appeal was taken, when the grant of the new trial did not come until 88 days after entry of the amended judgment or, if it had jurisdiction, whether it was correct on the merits.

The majority has decided that the trial court was acting with jurisdiction when it

entered the order for a new trial on August 8, 2003. I disagree. The majority also concludes that the motion to vacate, which was filed in relation to the judgment that was set aside, somehow survived the voiding of that judgment, and thus declines to address the procedural question of whether such motions filed prior to entry of a judgment are authorized or timely under our Rules of Civil Procedure. I believe this question is crucial, because the majority holding creates a "relation forward" doctrine that effectively nullifies the time limits set forth in the Civil Rules, and promotes the premature filing of motions that will lead to procedural messes such as the one in this case.

The majority view is that KLC had the right to rely on the judge's statement in his order attached to the "Final Judgment" for each of the Hills that its motions were "pending" and that the judgments were not final and appealable. At first glance, this is an appealing argument, but it does not outweigh the potential damage as to how the Civil Rules are applied. Oddly enough, both parties did think it appropriate to appeal the trial court's ruling granting a new trial, which could be nothing but interlocutory if the trial court had jurisdiction, which in turn explains why the Court of Appeals dismissed the appeals. (The proper avenue for relief if the trial court had no jurisdiction in issuing its new-trial order would have been a writ action.) In fact, regardless of the judge's statement, the May 12 judgments were final and thus appealable because there were no "pending" motions that would stop the running of time to file post-trial motions or the notice of appeal.

When a judgment is set aside and a new judgment is entered, all time periods *begin* to run from the date of entry of the new judgment by the clerk. CR 58. CR 59.02 requires that a motion for a new trial be served "not later than 10 days after entry of the judgment." CR 59.04 includes the same language—"[n]ot later than 10 days after entry of judgment"—with regard to a trial court granting a new trial sua sponte. Similarly, CR 59.05 requires a motion to alter, vacate or amend to be served "not later than 10 days after entry of the final judgment." Each rule refers to "*the judgment*"—not a judgment but the specific one the motion relates to.

The question then is whether the language "not later than" allows for such motions to be served *before* entry of the judgment. I believe that use of the language "after entry of the judgment" indicates that such motions must be filed after entry of the judgment, but before or on the tenth day after entry. That simply did not happen here. KLC's motions to vacate the judgment or for a JNOV were pending until the judgment they followed was set aside. Thereafter, they were void. KLC did not file such motions in regard to the May 12 judgment. Ten days after entry of that judgment, KLC was foreclosed from filing them. Thirty days thereafter, they forfeited their right to appeal by not filing a timely notice of appeal.

I concur in result, because under my reasoning I reach the same result as the majority: the verdict from the first trial stands and must be reinstated as the judgment in this case because no motion or appeal related to the May 12 judgment was timely filed. But I cannot concur that a trial court has discretion to ignore the Civil Rules, which is also the net effect of the majority ruling. If we allow the premature filing of substantive post-trial motions, we invite confusion. If we allow them to relate forward after entry of a new judgment, we compound the problem. What if the basis for the "pending" motion was on grounds that had no bearing on the new judgment? Would the trial court be

allowed to relate the motion forward to defeat the time limits, and then allow amendments to conform to the new judgment? What does this do to the purpose of the Civil Rules, which are, after all, this Court's own rules? The enacted Civil Rules are presumably made for a reason, and they are not *rules* at all if they are subject to being ignored at the judge's discretion; they would become mere guidelines.

I do agree that there are times when equity allows a trial court some discretion when there would otherwise be none, but this is not one of those times. The two parties are not in unequal positions, and the number of appeals our appellate courts review tells me that attorneys are not so intimidated by the judge's position that they will fail in their duty to raise appropriate issues. The judge was wrong in this case, and KLC had to act accordingly to ensure that its rights to post-trial motion and appeal were preserved. The Hills had no reason to appeal the first verdict, and did attempt to appeal the trial court's order for a new trial. They did all they could do (except, perhaps, seeking a writ).

Consequently, I believe the trial court did lose jurisdiction over this case after ten days from entry of the May 12 judgments. I would therefore reverse the Court of Appeals and remand for reinstatement of the May 12 judgments that were in accordance with the jury verdict in the first trial. I concur with the majority view regarding the award of post-judgment interest and attorneys' fees.