RENDERED: MARCH 24, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0011-MR

RYAN MCCOY AND
SARAH MOYER                                                    APPELLANTS


APPEAL FROM FAYETTE CIRCUIT COURT
v.          HONORABLE LUCY ANNE VANMETER, JUDGE
ACTION NO. 20-CI-03242


THE TEN TEN GROUP, LLC, D/B/A
WILSON'S GROCERY; CORLAND
MAPLE; AND HANNAH MAPLE                                        APPELLEES


OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, DIXON, AND EASTON, JUDGES.

CETRULO, JUDGE: This is an appeal of a Fayette Circuit Court order dismissing

employees' claims – before discovery – of wrongful discharge in violation of

public policy, and defamation.

## FACTS

The circuit court dismissed the complaint of Appellants, Sarah Moyer ("Sarah") and Ryan McCoy ("Ryan"), pursuant to Kentucky Rule of Civil Procedure ("CR") 12.02(f) for failure to state a claim upon which relief can be granted. For purposes of this appeal, we must accept as true the employees' factual allegations and draw all reasonable inferences in their favor. *Pike v. George*, 434 S.W.2d 626, 627 (Ky. 1968). Insomuch, we shall interpret the facts in a fashion most favorable to Ryan and Sarah and accept the material facts in the complaint as true. *Fox v. Grayson*, 317 S.W.3d 1, 7 (Ky. 2010).

Appellee Wilson's Grocery is a small shop offering groceries and food preparation services. At the relevant time period, there were only 10 non-management employees. Appellees Corland Maple ("Corland") and Hannah Maple ("Hannah," collectively, the "Maples") were the principals in the business, but did not handle the day-to-day operations. Ryan and Sarah started their employment with Wilson's Grocery in the summer of 2019 and remained in good standing at the store until the days prior to their termination.

During the COVID-19 pandemic, business increased at Wilson's Grocery, but pandemic-specific health and safety protocols for the employees were either implemented slowly or not at all. Employees used personal funds to purchase personal protective equipment and stayed after their paid, working hours

to sanitize the store.  Employees requested hazard pay and increased safety protocols, but these were initially denied by the Maples.

On March 30, 2020, Ryan organized a non-management staff meeting to discuss requesting higher hourly pay and additional health and safety measures. After the discussion, Ryan drafted a letter – which seven of the 10 non-management staff signed – and Ryan and Sarah emailed the letter to the Maples. Upon receipt, the Maples scheduled an all-employee meeting for April 2, 2020.

On April 1, 2020, the Maples informed the staff, via email, of possible, upcoming layoffs.  The next day, at the April 2 meeting, Corland Maples read the staff letter aloud, acknowledged the requests, and invited comments. Ryan and Sarah voiced concern about the Maples' perceived lack of concern for workers' safety and again requested hazard pay.  Ryan and Sarah were the only employees to speak at that meeting.  At the conclusion of the meeting, the Maples again denied the request for hazard pay, and it is unclear what additional health and safety methods were agreed upon.

On April 3, 2020, Ryan filed a complaint with the National Labor Relations Board, claiming that the Maples threatened layoffs in retaliation for

requesting hazard pay.[1]  Also that day, Ryan began feeling ill and informed the Maples he needed to take unpaid leave to monitor symptoms.

On April 4, 2020, Ryan and Sarah received emails from the Maples terminating their employment.  The emails claimed the decision was an attempt to "scale back" the pandemic workforce and was not due to their conduct.[2]  Wilson's Grocery also terminated two other employees around that time.

On April 5, 2020, Wilson's Grocery posted on their Instagram:

> We did not fire half our staff.  We accommodated two staff members that were uncomfortable and at risk so that they could continue to receive compensation during this time of isolation.  We did choose to eliminate a few who had bullied our team and made staff and customers alike feel uncomfortable.

Elsewhere on the store's Instagram page, a person who identified herself as a parent of a Wilson's Grocery employee wrote that there was a "petition demanding a pay raise that would have bankrupted the business[.]"  Additionally, the Maples allegedly stated to at least one other unidentified person that Ryan and Sarah had been "fired," described them as "bitter," and said they were to blame for another employee's discharge.

---

[1] It is not clear from the record what resulted from that complaint, nor whether that or other administrative remedies were exhausted.

[2] However, according to the complaint, on April 7, Hannah called Sarah and told her she was laid off so she could collect unemployment, and because "Ryan was experiencing COVID symptoms, and you cohabitate with him, so we can't have you in the store."

Ryan and Sarah then filed a complaint alleging two counts of wrongful termination in violation of public policy and one count of defamation. Wilson's Grocery filed a motion to dismiss. The Fayette Circuit Court granted the motion, dismissing the complaint before discovery. Ryan and Sarah appealed.

## I. STANDARD OF REVIEW

A motion to dismiss is a pure question of law; therefore, a reviewing court owes no deference to the circuit court's determination. *Fox*, 317 S.W.3d at 7. Instead, we review the issue *de novo. Id.* CR 12.02(f) is designed to test the sufficiency of a complaint. *Pike*, 434 S.W.2d at 627. It is proper to grant a CR 12.02(f) motion to dismiss if "it appears the pleading party would not be entitled to relief under any set of facts which could be proved in support of his claim. . . . Stated another way, the court must ask if the facts alleged in the complaint can be proved, would the plaintiff be entitled to relief?" *James v. Wilson*, 95 S.W.3d 875, 883-84 (Ky. App. 2002) (internal quotation marks and citation omitted).

## II. ANALYSIS

On appeal, Ryan and Sarah assert the circuit court erred in dismissing their two wrongful termination claims and one defamation claim. We will discuss each in turn.

## A. Wrongful Termination

Under Kentucky law, an employer may ordinarily "discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Firestone Textile Co. Div., Firestone Tire & Rubber Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983) (citation omitted). However, a narrow exception is applicable when the discharge was "contrary to a fundamental and well-defined *public policy* as evidenced by [an] existing . . . constitutional or statutory provision." *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985) (citation omitted); *see also Marshall v. Montaplast of N. Am., Inc.*, 575 S.W.3d 650, 652 (Ky. 2019) (emphasis added).

> Only three circumstances exist in which a discharge will be actionable as contrary to public policy: (1) when there are "explicit legislative statements prohibiting the discharge," (2) when "the alleged reason for the discharge . . . was the employee's failure or refusal to violate a law in the course of employment," or (3) when "the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment." *Hill v. Kentucky Lottery Corp.*, 327 S.W.3d 412, 422 (Ky. 2010) (quoting *Grzyb*, 700 S.W.2d at 402).

*Id*. Additionally, "the public policy involved must have an employment-related nexus." *Id.* (citing *Grzyb*, 700 S.W.2d at 402).

Here, Ryan and Sarah do not contest the at-will nature of their employment. They assert they were discharged because of their "exercise of a right conferred by well-established legislative enactment," which was in

-6-

contravention of public policy. They contend (i) Kentucky Revised Statute ("KRS") Chapter 338 ("KOSHA") provides the public policy of protecting Kentucky employees' right to "oppose unsafe workplaces"; and, (ii) KRS 39A ("Governor's Emergency Powers") provides the public policy of protecting a workers' right to "try to secure [an employer's] compliance with valid emergency orders of the government in times of community danger."

### i. KOSHA (KRS Chapter 338)

Ryan and Sarah argue that KOSHA – Kentucky's Occupational Safety and Health Employees Act – protects employees from retaliation for opposing unsafe workplaces. We agree, but those protections are not unlimited.

KOSHA is a fundamental and well-defined public policy. KOSHA, by its own words, was enacted to promote the safety, health, and general welfare of working Kentuckians. KRS 338.011. The statute mandates employers to furnish a place of employment which is free from recognized hazards that are causing or are likely to cause death or serious physical harm to employees. KRS 338.031. Further, the statute confers a right to employees to request the commissioner to conduct an inspection of perceived unsafe or unhealthy work conditions. KRS 338.121(1). KOSHA explicitly prohibits an employee's discharge for filing a

complaint or instituting legal proceedings related to the statute. KRS 338.121(3)(a).[3]

Here, the letter Ryan and Sarah sent to the Maples could qualify as a "complaint" under KOSHA. In 2016, our Kentucky Supreme Court found that an employee-to-employer letter complaining about unsafe work conditions could reasonably be interpreted as a "complaint" under KOSHA. *Ky. Occupational Safety & Health Review Comm'n v. Estill Cnty. Fiscal Ct.*, 503 S.W.3d 924, 930 (Ky. 2016). However, that situation involved an employee seeking to utilize the rights and remedies within KOSHA. Here, it is unclear from the record if Ryan and Sarah initiated any KOSHA steps prior to pursuing their wrongful termination claim. It is likely they did not, considering they are arguing that "[w]orkers who face public health and safety violations in the workplace are not relegated to filing complaints with [KOSHA] and hoping for the best." Conversely, Wilson's Grocery argues that Ryan and Sarah are bound by the rights and remedies within KOSHA, and that KOSHA cannot be the statutory underpinning for a wrongful termination claim.[4]

---

[3] KRS 338.121(3)(a) states, "No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or herself or others of any right afforded by this chapter[.]"

[4] Wilson's Grocery relies on *Benningfield v. Pettit Environmental, Inc.*, 183 S.W.3d 567 (Ky. App. 2005), an opinion built upon *Grzyb*, 700 S.W.2d 399. However, we will focus our analysis

-8-

In 1985, the Kentucky Supreme Court, in *Grzyb v. Evans*, "explained the circumstances in which the doctrine of preemption would block the creation of a common law claim for wrongful discharge in violation of public policy." *Hill*, 327 S.W.3d at 421. In *Grzyb*, a hospital employee filed suit against his hospital employer alleging wrongful discharge because he fraternized with a female hospital employee. *Grzyb*, 700 S.W.2d at 400. The employee asserted a claim for (1) common law wrongful discharge in violation of public policy; and (2) violation of his civil rights under KRS 344.040 – **both** based on sexual discrimination. *Id.* Ultimately, our Supreme Court found that Evan's common law wrongful discharge claim was preempted by the statutory remedies afforded under KRS Chapter 344 for civil rights violations. *Id.* at 401. In so finding, the Court stated, "[w]here the statute both declares the unlawful act and specifies the civil [remedies] available to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute." *Id*. In 2010, our Supreme Court further explained this rule and *Grzyb*'s application of the doctrine of preemption:

> Preemption [in *Grzyb*] was based on the fact that his sex discrimination claim was based on the *same law* as his wrongful discharge claim. *Grzyb*, 700 S.W.2d at 401-402. The only "fundamental and well-defined public policy" that Evans could articulate to meet the requirement for a wrongful discharge claim was the very same public policy

on the root case (*Grzyb v. Evans*) and apply the Kentucky Supreme Court's more recent interpretation of *Grzyb* in *Hill*, 327 S.W.3d 412.

embodied in the civil rights statutes of KRS Chapter 344.
*Hill*, 327 S.W.3d at 421.

The crux of the matter in *Grzyb* was the fact that both of his claims depended upon the same statutory language (KRS Chapter 344, sexual discrimination) and that statute proved a *remedy* for a specific *unlawful act*. In *Hill*, the Court clarified that "[w]hen preemption is properly applied, the common law claim is subsumed and eliminated by the overriding statutory scheme, and the remedy, if there is to be one, may only be found under the statute." 327 S.W.3d at 423 n.8. The statute that Ryan and Sarah's wrongful discharge claim is built upon (KOSHA) already has a remedy (to file a complaint with the commission, appeal to the commissioner, *etc.*), so a common law wrongful termination claim on those same grounds is preempted by the legislature's development of the remedy in the statute. Accordingly, this claim was properly dismissed by the circuit court, and we affirm.

### ii. Governor's Emergency Powers (KRS Chapter 39A)

Ryan and Sarah argue the Governor's emergency orders permit employees to "oppose flagrant violations of emergency orders designed to defend health and safety." They argue that although executive orders are not statutory or constitutional provisions, the Governor's emergency orders should be given the full effect of the law, and we should treat the orders, for purposes of this review,

the same as a statutory or constitutional provision. We agree, but still must affirm the circuit court on this issue.

On March 6, 2020, the Governor of Kentucky signed Executive Order 2020-215, declaring a state of emergency in the Commonwealth due to the COVID-19 global pandemic. Throughout the rest of 2020, additional executive orders and emergency regulations were issued to address the public health and safety issues created by the disease. KRS 39A.100 authorizes the Governor to declare such a state of emergency, and "KRS 39A.180 mandates that all emergency orders and administrative regulations issued by the Governor or any state agency shall have the full force of law[.]" *Beshear v. Acree*, 615 S.W.3d 780, 787 (Ky. 2020) (internal quotation marks omitted).

Pursuant to the authority in Executive Order 2020-215, the Department of Public Health issued an order on March 17, 2020, mandating public-facing businesses that could not comply with CDC[5] social distancing guidelines to cease all in-person operations. Businesses that provided food, grocery, and consumer goods could remain open, but needed to practice CDC guidelines including, but not limited to, "ensuring employees practice appropriate hygiene measures, including regular, thorough handwashing; ensuring that

---

[5] Centers for Disease Control and Prevention.

employees who are sick remain home; and regularly cleaning and disinfecting frequently touched objects and surfaces."

Executive Order 2020-246, signed on March 22, 2020, stated that the Governor was empowered to exercise powers necessary to promote and secure the safety and protection of Kentuckians. The *Amicus Curiae* brief filed by the Kentucky Equal Justice Center[6] argued that these Executive Orders provided employees the "right to be protected, 'to the fullest extent practicable,' by prescribed measures to slow the spread of COVID-19."

We agree that the Governor's orders had[7] the "full force of the law." *Beshear v. Acree*, 615 S.W.3d at 787. However, Ryan and Sarah needed to (1) point to an explicit statement in the Governor's orders that prohibited their discharge; (2) show that their discharge was for a failure or refusal to violate the Governor's orders in the course of employment; or (3) demonstrate that their discharge was due to their exercise of a right conferred by the Governor's emergency orders. We can easily dismiss the first two possibilities: Ryan and Sarah did not (1) point to any explicit statement in the Governor's orders prohibiting their discharge, nor (2) were they discharged for failing or refusing to

---

[6] The Kentucky Equal Justice Center filed an *Amicus Curiae* appellate brief on this issue alone.

[7] The legislature has since revoked some of the Governor's powers; however, we apply the law as it was written at the relevant time.

-12-

violate the Governor's orders. They admit that the Governor's orders "need[] to confer rights on employees or seek to protect the public in some way that relates to employment," but they needed to show more than just the existence of an employment-related nexus. They needed to show that their discharge was due to their exercise of a right conferred by the Governor's emergency orders.

Ryan and Sarah argue that the hygiene and transmission concerns that they brought to the attention of Wilson's Grocery were the same rights conferred by the executive orders. They argue that because Wilson's Grocery had not implemented safe systems in the grocery store and food preparation setting, they had a right to report those concerns to their employer. "The workplace was not safe for [Ryan and Sarah] because of [those hygiene and safety failures], nor was it safe for any of [Ryan and Sarah's] co-workers or the customers they served." However, while we certainly disapprove of firing of employees merely for voicing concerns about health and safety, we cannot *find* a right where none is conferred. *See Marshall*, 575 S.W.3d at 655.

In *Marshall*, an employee accurately informed some of her coworkers that one of their supervisors was a registered sex offender. *Id*. at 651. Shortly thereafter, the employee was discharged and subsequently filed a complaint alleging wrongful discharge in violation of public policy. *Id*. The employee claimed that the Kentucky Sex Offender Registration Act established a public

policy that the sex offender registry should be open and accessible to everyone. *Id.* However, the trial court granted the employer's motion to dismiss for failure to state a claim; this Court affirmed the decision, as did our Supreme Court.

In *Marshall*, our Supreme Court found that (a) the objective of the Sex Offender Registration Act was to protect the public; (b) information from the sex offender registry must be publicly available and publicly disseminated; and (c) the Act provides immunity from criminal and civil liability for anyone who disseminates information from the registry in good faith. *Id.* at 655. Yet despite this, the Court concluded that the Act did not create a *right to engage* in an act. *Id.* "The **statute** must make clear that it intends to protect employees in their employment situation. As much as we may wish to, this Court cannot, by judicial fiat, insert that right into the statutory scheme." *Id*. at 656.

Similarly, here, we cannot find an "explicit right" in the Governor's orders – for Ryan and Sarah to challenge Wilson's Grocery's handling of health and safety regulations – sufficient to satisfy the narrow public policy exception of the terminable-at-will doctrine. Ryan and Sarah were not fired for exercising a right conferred by the Governor's executive orders (or well-established legislative enactment). Therefore, Ryan and Sarah cannot establish a wrongful termination claim in violation of a public policy that created a specific right under KRS

Chapter 39A.  Thus, we need not discuss the existence of an employment nexus.

Again, we must affirm.

## B. Defamation

The requisite elements of defamation are:  (1) false and defamatory language,[8] (2) about the plaintiff, (3) which is published to a third party, and (4) which causes injury to reputation.  *Columbia Sussex Corp., Inc. v. Hay*, 627 S.W.2d 270, 273 (Ky. App. 1981).  "Statements classified as defamatory per se include those which attribute to someone a criminal offense, a loathsome disease, serious sexual misconduct, or *conduct which is incompatible with his business, trade, profession, or office*."  *Gilliam v. Pikeville United Methodist Hosp. of Ky., Inc.*, 215 S.W.3d 56, 61 (Ky. App. 2006) (emphasis added) (citation omitted). Such statements must tend to expose the plaintiff to public hatred, ridicule or contempt or disgrace, or induce such an evil opinion of the plaintiff as to deprive him of friendship.  *Id*. at 61.  Whether an alleged statement constitutes defamation *per se* is a matter of law.  *Columbia Sussex*, 627 S.W.2d at 274.

Ryan and Sarah argue that the Appellees "engaged in . . . an extensive propaganda campaign to discredit and harm" them.  They asserted that the

---

[8] We use "defamation" throughout this Opinion to include slander (oral defamation) and libel (written defamation).  "Generally speaking, defamation is simply a claim for injury to one's reputation."  *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 281 n.7 (Ky. 2014).

statements were (1) a written statement posted on Wilson's Grocery's Instagram page; and (2) spoken statements by the Maples:[9]

> Statement 1 (written social media post): "We did not fire half our staff. We accommodated two staff members that were uncomfortable and at risk so that they could continue to receive compensation during this time of isolation. We did choose to eliminate a few who had bullied our team and made staff and customers alike feel uncomfortable."

> Statement 2 (verbal statement): the Maples stated to at least one unidentified person that Ryan and Sarah had been "fired," described them as "bitter," and represented that they had caused another employee's discharge.

Here, Ryan and Sarah argued that these statements resulted in an actionable claim for defamation *per se*, contending that the statements are false, damage their reputation, and challenge their fitness to perform their job. They admit that they were not specifically identified in the written statement, but they contend the statement complained of ("We did choose to eliminate a few who had bullied our team and made staff and customers alike feel uncomfortable.") can be reasonably understood to be about them. However, the complaint also asserted that they were told by the Maples that they were not fired but were laid off so they could collect unemployment, which was also part of the post above. The complaint confirms that other employees were let go as well.

_____

[9] Ryan and Sarah argue a third statement was allegedly defamatory, but they admit it was written by a "parent of an unidentified employee" of Wilson's Grocery, not a party to this appeal nor a representative of Wilson's Grocery, and therefore not relevant to our review.

-16-

Thus, we first question whether Ryan and Sarah were sufficiently identified for purposes of establishing defamation *per se*. We recognize that Wilson's Grocery is a small local shop and that friends and acquaintances familiar with the incident might have reasonably understood it to have been about Ryan and Sarah (even before Sarah's own social media explanation). However, it is not clear to this Court that a reader would have known if they were the staff accommodated or if they were among the "few" who "bullied" the team. Still, the circuit court did consider the allegations in the light most favorable to them, and even "assuming that the statement was understood to be about Ryan and Sarah", did not find it to be false and defamatory *per se*.

"A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory fact as the basis for the opinion." *Yancey v. Hamilton*, 786 S.W.2d 854, 857 (Ky. 1989), citing RESTATEMENT (SECOND) OF TORTS § 566 (1977)).

The issue is whether the statements are false and tend to injure one in his reputation or expose him to public hatred, contempt, scorn, obloquy, or shame. *Stringer v. Wal-Mart Stores*, 151 S. W.3d 781, 795 (Ky. 2004), *overruled on other grounds by Toler*, 458 S.W.3d 276. Generally, "[f]alse allegations of unfitness to perform a job are *per se* defamatory." *Estepp v. Johnson Cnty. Newspapers, Inc.*,

578 S.W.3d 740, 744 (Ky. App. 2019) (internal quotation marks and citation omitted). However, it is not defamatory to simply state someone was "fired." *Id.* at 744-45 (citation omitted).[10] Stating that someone was discharged for drinking or for theft is far different than describing an employee as bitter or a bully as the case law illustrates.

We agree with the circuit court that those comments are more in the nature of opinion that does not rise to the level of defamation *per se*. In *Desai v. Charter Communications, LLC*, 381 F. Supp. 3d 774, 784 (W.D. Ky. 2019), a federal court applying Kentucky law was faced with an employer who attributed a theft of printers to certain employees. The Court reviewed Kentucky case law and noted that certain types of statements – including false accusations of theft – are presumed to have damaged the plaintiffs' reputations, and thus no proof of injury resulting from such statements is required: they are "actionable per se." Similarly,

---

[10] *Estepp*, 578 S.W.3d at 745, explains:

> [D]efamation has been found in our Kentucky cases in which a statement of discharge was combined with an imputation of unfitness. In *Louisville Taxicab & Transfer Co. v. Ingle*, 229 Ky. 578, 17 S.W.2d 709, 710 (1929), "[t]he words written on the blackboard, 'Ingle discharged for drinking,' in their ordinary acceptance mean that he was unfit for his occupation by reason of his indulgence in drinking." The Court clarified that publication of those words was libelous per se because "they impute unfitness to perform the duties of an office or employment, or . . . prejudice a person in his profession or trade" by "not only stat[ing] the fact of plaintiff's discharge, but the reason for it." Similarly, in *McCauley v. Elrod*, 16 Ky.L.Rptr. 291, 27 S.W. 867, 868 (Ky. 1894), the Court held that the statement "I discharged Elrod for stealing," was actionable.

in *Stringer v.* 151 S.W.3d at 793, the terminated employees alleged that they were falsely painted as thieves.

In contrast, however, more ambiguous statements of opinion "require evidence of pecuniary loss arising from the use thereof"; and affirmative proof of injury that is actionable without any development of extrinsic facts or circumstances. *Desai*, 381 F.Supp. 3d at 785. For example, we deemed ambiguous and opinion language to be unactionable in *Foster v. Jennie Stuart Medical Center, Inc.*, 435 S.W.3d 629 (Ky. App. 2013), when two nurses were terminated and a publication was made that their termination was in the "best interests of the institution." The allegations of someone bullying another, or being bitter, even if proven, simply do not rise to the level required to impute unfitness for their profession and are mere opinion statements requiring affirmative proof of injury. There was no such evidence or claim contained within the complaint in this case.

In summary, the statements complained of are both true (they were fired) and are opinion statements that are incapable of being proven objectively incorrect, so they are not defamatory *per se*. Even if the facts alleged in the complaint could be proved, the plaintiffs would not be entitled to relief. *James v. Wilson*, 95 S.W.3d 875, 883-84 (Ky. App. 2002). Thus, on this claim as well, dismissal was not in error.

## CONCLUSION

The judgment of the Fayette Circuit Court is AFFIRMED as to all counts.

ALL CONCUR.

BRIEFS FOR APPELLANTS:

Robyn Smith
Adam Johnson
Louisville, Kentucky


BRIEF FOR APPELLEES THE TEN TEN GROUP, LLC, D/B/A WILSON'S GROCERY; CORLAND MAPLE; AND HANNAH MAPLE:

Robert L. Abell
Lexington, Kentucky


BRIEF OF *AMICUS CURIAE* FOR KENTUCKY EQUAL JUSTICE CENTER:

John S. Friend
McKenzie Cantrell
Louisville, Kentucky