RENDERED:  NOVEMBER 1, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1047-MR

VERONICA LINDSEY CAUDILL-
ENGLE, D.O.                                                          APPELLANT


                    APPEAL FROM BREATHITT CIRCUIT COURT
v.                  HONORABLE LISA HAYDEN WHISMAN, JUDGE
                    ACTION NO. 23-CI-00016


QUANTUM HEALTHCARE
ASSOCIATES, PSC                                                      APPELLEE


OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  ECKERLE, GOODWINE, AND McNEILL, JUDGES.

ECKERLE, JUDGE:  Appellant, Veronica Lindsey Caudill-Engle, D.O. ("Dr.

Caudill"), seeks review of an order of the Breathitt Circuit Court dismissing her

wrongful termination claim against her employer, Appellee, Quantum HealthCare

Associates, PSC ("Quantum").  We conclude that the Trial Court improperly

considered matters outside of the pleadings to support Quantum's motion to

dismiss.  We further conclude that there were disputed issues of fact regarding

whether there is a well-defined, public policy that would establish an exception to the terminable-at-will doctrine. Consequently, the Trial Court erred by dismissing Dr. Caudill's complaint against Quantum. Hence, we reverse and remand to allow the parties to engage in discovery and for additional proceedings.

Quantum provides staffing for various hospitals and medical facilities, including Hazard Appalachian Regional Hospital (the "Hospital") and Kentucky River Medical Center (the "Medical Center"). Starting in October 2017, Quantum employed Dr. Caudill to provide medical services at facilities with which it had contracts. Quantum initially assigned Dr. Caudill to work at the Hospital, and beginning in February 2021, it authorized Dr. Caudill to see patients at the Medical Center as well. On or after August 2021, Quantum assigned Dr. Caudill to work as a hospitalist exclusively at the Medical Center.

From October 2021 through February 2022, Jackson Hospital Corporation (the "Corporation"), the operator of the Medical Center, authorized physicians to treat COVID-19 patients with the antiviral medication Remdesivir, Vitamin D, Zinc, and steroids. The Corporation did not approve the antiparasitic drug Ivermectin as a treatment option for patients with COVID-19, but it did not forbid it. On February 3, 2022, Dr. Caudill prescribed Ivermectin for two COVID-19 patients at the Medical Center. Quantum terminated Dr. Caudill's employment the following day, on February 4, 2022.

-2-

On January 30, 2023, Dr. Caudill filed a complaint asserting various claims against Quantum, the Corporation, and Appalachian Regional Healthcare, Inc. ("Appalachian Healthcare"). Specifically, regarding Quantum, Dr. Caudill's complaint pleaded claims for wrongful termination and tortious interference with a doctor-patient relationship. Regarding the Corporation and Appalachian Healthcare, Dr. Caudill pleaded claims for tortious interference with her business relationship with Quantum and violation of her rights to administrative due process.

Quantum moved to dismiss for failure to state claims against it. Following briefing, the Trial Court granted the motion, concluding that Dr. Caudill failed to show that Quantum's termination of her employment violated any well-established public policy. Thereafter, Dr. Caudill filed a motion to alter, amend, or vacate pursuant to Kentucky Rule of Civil Procedure ("CR") 59.05.

In addition to challenging the dismissal of her wrongful termination claim against Quantum, Dr. Caudill requested that the Trial Court remove the "final and appealable" language from the Order. Dr. Caudill noted that she had asserted multiple claims against Quantum, the Corporation, and Appalachian Healthcare, and that the Order dismissing only one of those claims did not dispose of all of the relevant claims. On August 11, 2023, the Trial Court entered a calendar order denying Dr. Caudill's motion. It also stated at the August 11

hearing that it was dismissing all claims against Quantum. This appeal followed. This Court subsequently dismissed the Corporation and Appalachian Healthcare, as the claims against those parties remain pending in the Trial Court.

As an initial matter, Dr. Caudill clearly pleaded claims against Quantum for wrongful termination and tortious interference with a doctor-patient relationship. However, Quantum's motion to dismiss only addressed the first claim. Likewise, the Trial Court's written orders only dismiss the wrongful termination claim. However, at a hearing, the Trial Court, apparently orally and *sua sponte*, dismissed the tortious interference claims. The record contains no basis for this dispositive decision. The Trial Court speaks only through its "written orders entered upon the official record." *Kindred Nursing Centers Ltd. P'ship v. Sloan*, 329 S.W.3d 347, 349 (Ky. App. 2010). Thus, any dispositive rulings by the Trial Court cannot be considered by this Court on appeal unless specifically incorporated into a written and properly entered order. *Id.*

This Court conducts a *de novo* review of the Trial Court's dismissal under CR 12.02(f) for failure to state a claim. *Carruthers v. Edwards*, 395 S.W.3d 488, 491 (Ky. App. 2012). "Since a motion to dismiss for failure to state a claim upon which relief may be granted is a pure question of law, a reviewing court owes no deference to a trial court's determination; instead, an appellate court reviews the issue *de novo.*" *Fox v. Grayson*, 317 S.W.3d 1, 7 (Ky. 2010) (citing *Morgan v.*

-4-

*Bird*, 289 S.W.3d 222, 226 (Ky. App. 2009)). The pleadings are to be "liberally construed in a light most favorable to the plaintiff[,]" and all allegations in the complaint are to be taken as true. *Mims v. Western-Southern Agency, Inc.*, 226 S.W.3d 833, 835 (Ky. App. 2007) (citing *Gall v. Scroggy*, 725 S.W.2d 867, 869 (Ky. App. 1987)).

Dr. Caudill first argues that the Trial Court should have treated Quantum's motion to dismiss as a motion for summary judgment, and that there were genuine issues of material fact that precluded relief. It is well-established that reliance on matters outside of the pleadings effectively converts a motion to dismiss into a motion for summary judgment. *See McCray v. City of Lake Louisvilla*, 332 S.W.2d 837, 840 (Ky. 1960). In support of its motion to dismiss, Quantum submitted a joint press release from the American Medical Association ("AMA"), American Pharmacists Association, and the American Society of Health System Pharmacists. In that release, these organizations stated their collective opposition to the use of Ivermectin to prevent or treat COVID-19 outside of a clinical trial. Quantum also referenced advisories from the Centers for Disease Control and the Food and Drug Administration indicating that Ivermectin is not authorized or approved for the prevention or treatment of COVID-19.

Thus, Quantum clearly introduced matters outside of the pleadings to attempt to rebut Dr. Caudill's claim that she had a protected right to prescribe any

-5-

medication according to her best judgment. Thus, the Trial Court should have treated the motion as one for summary judgment. Even disregarding the AMA evidence, we conclude that there were other genuine issues of material fact that precluded a judgment as a matter of law. While the above-stated background facts are undisputed, at this early stage of the litigation, most of the facts underlying the dispute are unknown as either absent entirely or undeveloped. And the unrequested, unbriefed, oral dismissal of the tortious interference claims is wholly unsupported.

Dr. Caudill stated that in her opinion as a physician, the two patients would not medically tolerate Remdesivir, and thus she prescribed Ivermectin. Quantum, the Hospital, the Medical Center, and the Corporation have not explicitly commented upon whether Dr. Caudill's medical opinion in that regard is genuinely held, sound, or permitted. However, none of those organizations prohibited doctors from administering Ivermectin to patients. Instead, they failed to condone it. The meaning of that distinction has not been clarified.

None of the organizations have averred that they practice medicine; however, none have conceded that they do not practice medicine. No one has provided evidence that any organization is or is not permitted to forbid doctors from prescribing certain medicines that they believe are medically appropriate. Whether the Corporation's or the AMA's disapproval of prescribing Ivermectin for

COVID-19 translated into an automatic – and permitted – disallowance of the practice is likewise murky. The reasons for the lack of approval are unknown. Were they based on insufficient information about the drug and its effects of persons, or rather profit or something else? Was it a universal impugning of the drug for every patient, or just those who could not tolerate it, or merely those who had first tried other drugs unsuccessfully?

The sparse record before us does not show that any of the organizations prevented the drug from being administered to the patients. Yet, Dr. Caudill contends that she was terminated because she sought to administer this drug. The record also does not clearly establish that the Corporation immediately revoked Dr. Caudill's staff privileges at the Medical Center. However, Dr. Caudill's complaint alleges that the Corporation's actions "constituted an actual revocation and/or a de facto revocation" of her staff privileges at the Medical Center. Thus, it is unclear whether Quantum terminated Dr. Caudill's employment before the Corporation revoked her staff privileges at the Medical Center. In addition, neither the record nor the pleadings show that the Corporation had published guidelines regarding acceptable treatments for COVID-19 at the time of the dispute.

The undeveloped factual record renders insufficient support for the proper determination of the legal central question: has Dr. Caudill stated an

actionable, legislative public policy that would support her wrongful termination claim against Quantum? Under Kentucky law, an employer may ordinarily "discharge his at-will employee for good cause, for no cause, or for a cause that some might view as morally indefensible." *Firestone Textile Co. Div., Firestone Tire and Rubber Co. v. Meadows*, 666 S.W.2d 730, 731 (Ky. 1983). "An exception to this rule exists when the termination violates public policy as expressed by the employee's exercise of a constitutional or statutory right, which may give rise to an action for wrongful termination." *Greissman v. Rawlings and Associates, PLLC*, 571 S.W.3d 561, 563 (Ky. 2019). In *Marshall v. Montaplast of North America, Inc.*, 575 S.W.3d 650 (Ky. 2019), the Kentucky Supreme Court recently summarized the scope of the public policy exception, stating as follows:

> Only three circumstances exist in which a discharge will be actionable as contrary to public policy: (1) when there are "explicit legislative statements prohibiting the discharge," (2) when "the alleged reason for the discharge . . . was the employee's failure or refusal to violate a law in the course of employment," or (3) when "the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment." *Hill v. Kentucky Lottery Corp.*, 327 S.W.3d 412, 422 (Ky. 2010) (quoting [*Grzyb v. Evans*, 700 S.W.2d 399, 402 (Ky. 1985)]). Further, the public policy involved must have an employment-related nexus. *Grzyb*, 700 S.W.2d at 402.

*Id.* at 652.

Dr. Caudill does not point to any explicit legislative enactment prohibiting her discharge. Furthermore, she does not allege that the discharge was the result of her failure or refusal to violate a law. Rather, Dr. Caudill contends that she was terminated for the exercise of her independent medical judgment as protected by well-established public policy and legislative enactment. In support of this argument, she notes that Kentucky Revised Statutes ("KRS") 311.597(4) defines "dishonorable, unethical, or unprofessional conduct of a character likely to deceive, defraud, or harm the public or any member thereof" to include:

> Conduct which is calculated or has the effect of bringing the medical profession into disrepute, including but not limited to any departure from, or failure to conform to the standards of acceptable and prevailing medical practice within the Commonwealth of Kentucky, and any departure from, or failure to conform to the principles of medical ethics of the American Medical Association or the code of ethics of the American Osteopathic Association. For the purposes of this subsection, actual injury to a patient need not be established.

Dr. Caudill further refers to Principle VII of the AMA Code of Ethics, which provides that "[a] physician shall, while caring for a patient, regard responsibility to the patient as paramount." She also points to Section 11 of the American Osteopathic Association's Code of Ethics, which provides that "[i]n any dispute between or among physicians regarding the diagnosis and treatment of a patient, the attending physician has the responsibility for final decisions, consistent with any applicable hospital rules or regulations."

Based on these provisions, Dr. Caudill argues that she had a legal and ethical responsibility to exercise her professional judgment in a manner to best serve the needs of her individual patients. She maintains that Quantum's termination of her employment interfered with the exercise of that judgment. Consequently, Dr. Caudill contends that Quantum's actions constitute a violation of a clear public policy and serve as actionable grounds for her wrongful termination action.

Dr. Caudill also takes the position that the public policy expressed in the statute and these rules prohibit an employer from terminating a treating physician based solely only on disagreements over patient care. Rather, she asserts that she may only be terminated for disagreements over patient care after receiving full due process in proceedings by either the Board of Medical Licensure or an administrative process under the Medical Center's bylaws.

We agree that the initial determination of the existence of an actionable public policy is a question of law. *Grzyb*, *supra*, at 401. *See also Firestone*, *supra*, at 731-32. An obligatory rule of professional conduct may qualify as a public policy for purposes of a wrongful termination claim. *Greissman*, 571 S.W.3d at 567. While neither the statute nor the professional rules explicitly give the attending physician unfettered discretion regarding patient treatment, they clearly afford the physician some discretion. Moreover, the rules

-10-

are designed to allow a physician to exercise her best professional judgment in making treatment decisions tailored to the needs of particular patients. Thus, the rule is designed to serve the interests of the public at large and not the sole needs of the profession. *Id.*

Under these circumstances, factual questions clearly remain as to whether the statute and ethical principles imposing a general obligation upon physicians to be responsible for patient care granted Dr. Caudill a right to prescribe disapproved treatment that was not forbidden. And which organization can disapprove of such treatment is unclear: Quantum, the Hospital, the Medical Center, the Corporation, and/or the AMA. Further, whether such disapproval or non-allowance translates into a prohibition against the prescription and by whom is factually undeveloped as no factual evidence was permitted before dismissal. Here, Dr. Caudill did not merely disagree with the recommendation, she declined to follow it in two circumstances. And perhaps there were more instances, but these facts are also unknown. Whether Quantum's firing of Dr. Caudill violated public policy by essentially forbidding her from using her medical training and judgment to treat these two patients with Ivermectin necessarily involves some fact-finding, and that is absent here. By this ruling, we do not suggest that a physician's discretion in making treatment decisions for patients is unlimited. But factual issues remain as to whether Quantum's or the Corporation's disagreement

-11-

with Dr. Caudill's application of the treatment protocols constituted an improper interference with her protected right to exercise her professional judgment with regard to these two patients. And Quantum admits that the state licensure board can discipline doctors who violate AMA "principles," but no discipline was apparently sought or received here for reasons yet unknown. There was no formal medical review or finding here that Dr. Caudill's conduct with regard to these two patients was improper. And without any evidence, whether "principles" are "guidelines" or actually requirements is also left to conjecture. Doctors are hired to exercise their medical judgment. Thus, factual questions exist as to the reasons that Dr. Caudill was fired for exercising it, especially under circumstances such as this where the press release appeared to offer only a cautionary warning in general.

At this early juncture in this case, Quantum failed to establish that it was entitled to judgment as a matter of law on this issue. And it offered no evidence or argument about dismissing the tortious interference claim. At a minimum, Dr. Caudill is entitled to additional discovery to address the merits of her claim of a public policy exception to the at-will employment doctrine. Until such time as the record is further developed, the dismissal (which operated as a summary judgment by considering facts outside the record) was not proper. Therefore, we conclude that the Trial Court erred by dismissing Dr. Caudill's claims against Quantum. And as noted above, Dr. Caudill's other claims against

the Corporation and Appalachian Healthcare remain pending before the Trial Court.

Accordingly, we reverse the order of the Breathitt Circuit Court dismissing Dr. Caudill's claims against Quantum and remand for additional discovery proceedings on the merits of those claims.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Anthony J. Bucher
Covington, Kentucky

BRIEF FOR APPELLEE:

Ryan M. Martin
Cincinnati, Ohio